Filed 1/11/23  In re Andrew W. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ANDREW W. et al., Persons Coming Under the Juvenile Court Law. | B318745 (Los Angeles County Super. Ct. No. DK10292B-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ANDREW W., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Susan Ser, Judge.  Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Andrew W. (father) appeals from an order terminating his parental rights over Andrew (born 2008) and Khailan (born 2009). He contends the order must be reversed because the beneficial parent-child exception to terminating parental rights applies.

We affirm the juvenile court's order.

## BACKGROUND

### Detention, Welfare and Institutions Code[1] section 300 petition, and adjudication

Andrew and Khailan were six and five years old, respectively, when they and their younger siblings Camiyah and Kamerhon[2] were detained from father and their mother, Candi C.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] The juvenile court terminated father's and mother's parental rights as to Camiyah and Kamerhon in 2019. We affirmed that order in a nonpublished opinion. (*In re Camiyah W.* (Jan. 29, 2020, B297759).) During this case, father and mother had another child, Kayhlin (born 2018), who was removed from parental custody after the juvenile court sustained a section 300 petition on her behalf. (See *In re Kayhlin W.* (Nov. 4. 2020, B302895) [nonpub. opn.].)

2

(mother)[3] in March 2015.  Only Andrew and Khailan are subjects of this appeal.

In June 2016, the juvenile court sustained an amended petition under section 300, subdivision (b), that the children were at substantial risk of harm because of the parents' substance abuse.  Both parents were accorded monitored visits and family reunification services.  The court ordered the parents to participate in a drug rehabilitation program with random testing, parenting classes, and individual counseling.

**Review period and termination of reunification services**

In August 2016, the Department reported that the parents visited weekly with the children.  The parents were attentive during the visits, and the children appeared to be happy and comfortable in their parents' presence.

Following a child and family team meeting in February 2017, the Department reported that the parents had positive interaction with the children during their monitored visits.  There was conflict, however, between the parents and the children's caregiver, who complained they were not adhering to the visitation schedule and were intimidating her.  The Department initiated action to have the children replaced with a different caregiver.

By September 2017, neither parent had complied with their case plans.  Khailan and Andrew were exhibiting behavioral problems that worsened after visits with their parents.  Khailan's behavior at school was so extreme that he was placed on home study.  The school principal reported that father and mother were

---

[3]     Mother is not a party to this appeal.

3

seen loitering near the school campus and asked the Department to seek a restraining order to keep the parents away from the children's school. The juvenile court terminated reunification services on September 25, 2017, and set a section 366.26 hearing.

**Section 366.26 proceedings**

In January 2018, the Department reported that the parents visited regularly with the children and brought food for the children to eat. The children appeared happy to see the parents, and father played football with Andrew and Khailan. The parents had trouble controlling the children's behavior at times, but most of the visits were appropriate. Both parents visited consistently with the children through August 2018. They were affectionate and appropriate but failed to progress to unmonitored visitation because of noncompliance with court orders.

In May 2018, the Department reported that Andrew and Khailan's caregiver was willing to become the children's legal guardian but was not interested in adoption. Andrew had initially exhibited behavioral issues when first placed with the current caregiver, but his behavior had since improved. Khailan was still on home study because of behavioral issues at school. The Department recommended continuing the section 366.26 hearing for 120 days for additional time to find an adoptive home for Andrew and Khailan.

Andrew and Khailan were placed with a new caregiver, Ms. N., in July or August 2018.

**Section 388 petition and reinstatement of reunification services**

Father filed a section 388 petition to have his reunification services reinstated. In March 2019, the juvenile court granted

4

the petition and accorded father an additional six months of reunification services.  From March through May of 2019, both parents continued to visit consistently with the children.

Andrew and Khailan remained placed with Ms. N.  The children referred to Ms. N. as "mom" and appeared to be loving and comfortable with her.  Andrew reported that he enjoyed living with Ms. N. and wanted to continue to do so.  Khailan similarly reported that he enjoyed living with Ms. N. and felt safe and loved in her home.  Both children consistently stated that they love being with Ms. N. but that they love their parents also. Andrew and Khailan said they wanted final decisions to be made regarding their placement and permanency.

Ms. N. said she wanted to adopt Andrew and Khailan.  She expressed her commitment to maintaining the children's relationship with their siblings and said she would continue to facilitate sibling visits after the adoption is finalized.

**Second termination of reunification services**

Father's reunification services were again terminated on February 6, 2020.  His visits remained monitored,  and the juvenile court set a section 366.26 hearing.

**Section 366.26 proceedings**

The children's court appointed special advocate submitted a report in February 2021 informing the juvenile court that Ms. N. had purchased a home in Lancaster and that she and the children would be moving there in the spring.  Andrew and Khailan were looking forward to the move, as each would have his own room.  Both children reported that they enjoy living with Ms. N. and feel loved, secure, and well cared for.  The children said they loved their parents, but if reunifying with them was not possible, they wanted to remain with Ms. N.  The special

advocate recommended that Ms. N. be considered the children's prospective adoptive parent.

In February 2021, the Department reported that an adoptive home study for Ms. N. was pending and requested a 120-day continuance to allow the home study to be completed.

The Department reported in June 2021 that father's last visit with the children had been in November or December 2020. Ms. N. reported that Andrew and Khailan were both on basketball teams, and they attended the games together as a family. She said she spent as much time with the children as she could. The family went out to dinner together, played games, and watched movies together.

Ms. N. was building a three-bedroom, two-bath home that would be ready in May 2021. She and the children currently lived in her parents' home. Ms. N. reported that Andrew and Khailan were very close to her parents and to her older sister. Ms. N.'s extended family members viewed Andrew and Khailan as part of the family.

In August 2021, the Department reported that Andrew and Khailan were both doing well in school. They participated in extracurricular activities such as basketball and played in tournaments throughout the county. Both children said they enjoyed living with Ms. N. and felt safe and loved in her home. They referred to Ms. N. as "mom" and said they wanted to be adopted and to continue living with her. Andrew and Khailan both said they loved their parents, but they also wanted permanency and were waiting for the adoption process to be completed.

**Section 366.26 hearing**

Father was present at the section 366.26 hearing held on October 8, 2021 but did not testify. The children's counsel told the juvenile court that she had spoken with Andrew and Khailan prior to the hearing. Both children stated that they love their parents but they are comfortable with Ms. N. and do not want to be removed from her care. Andrew and Khailan both understood that Ms. N. wanted a closed adoption. They did not want anything to derail their placement with her. The children's counsel joined with the Department's request to terminate parental rights.

Father's counsel objected to the termination of parental rights. He said that father spoke to Andrew and Khailan weekly via FaceTime and shared a relationship with them. Counsel pointed out that because the children's caregiver wanted a closed adoption, terminating parental rights would preclude Andrew and Khailan from seeing or speaking to father until they were 18 years old.

After hearing argument from counsel, the juvenile court admitted into evidence documents submitted by the Department and took judicial notice of the electronic case file. The court then made the following findings:

"Regarding the parental bond exception, the parents must show by preponderance of the evidence that the parental relationship would benefit the child. It has to be a significant benefit. The parents need to show a parental role towards the child, more than just an emotional bond. I know the parents love the child—the children, and the children love the parents. That's evident. But, it has to be more than

just that emotional bond, and also that terminating parental rights would be detrimental to the children.

> "The children have been with the current placement since 2019, and as [childrens' counsel] indicated, they are doing well and wish to remain in their care."

The juvenile court found that any benefit to the children from maintaining the relationship with their parents was outweighed by the physical and emotional benefit they would have through adoption. The court found by clear and convincing evidence that the children were adoptable and that no exception to terminating parental rights applied. The juvenile court terminated parental rights and ordered the children freed for adoption.

This appeal followed.

## DISCUSSION

### I. Applicable law and standard of review

Once a juvenile court has terminated reunification services and determined that a child is adoptable, the court is required to terminate parental rights unless it finds an applicable exception. (§ 366.26, subd. (c)(1).) The exception at issue here, sometimes referred to as the beneficial parent-child exception, applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child," because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

The parent bears the burden of proving that the exception applies. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952-954.) To

8

do so, the parent must prove three statutory elements: "(1) regular *visitation and contact*, (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).)

For the first element, visitation, the question is simply whether the parent visited consistently, as permitted by court orders. The focus is not on punishing or rewarding parents for their behavior in visiting or maintaining contact but on the best interests of the child. (*Caden C., supra*, 11 Cal.5th at p. 632.)

As to the second element, whether the child would benefit from continuing the relationship, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C., supra*, 11 Cal.5th at p. 636.) The parent must also show that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) Relevant factors in assessing the parent-child relationship include "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*Id.* at p. 576.) For the third element, whether termination would be detrimental to the child, the court must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C., supra*, at p. 633.)

9

We review the juvenile court's findings concerning visitation and whether the child would benefit from continuing the relationship with the parent for substantial evidence. (*Caden C., supra*, 11 Cal.5th at pp. 639-640.) Whether termination of parental rights would be detrimental to a child because of the child's relationship with the parent is a question we review for abuse of discretion. (*Ibid.*)

## II. No abuse of discretion

Father did not sustain his burden of proving that his relationship with Andrew and Khailan promoted the children's well-being to such a degree as to outweigh the benefits they would gain in a permanent adoptive home with Ms. N.[4]

At the time of the section 366.26 hearing, Andrew and Khailan had been removed from father's care for approximately six and a half years—more than half of their lives. Father had never progressed beyond monitored visitation and had no in person visits with the children for almost a year before the section 366.26 hearing. Both children were closely bonded with their prospective adoptive mother, Ms. N., and wished to remain in her care. Although the children said they loved their parents, they also said they wanted finality in their placement and wished

_____

[4] The parties dispute whether father met his burden of showing consistent visitation. Father must establish all three elements of the beneficial parent-child exception. (*Caden C., supra*, 11 Cal.5th at p. 631.) He did not sustain his burden of proving that he and the children shared a substantial positive attachment that outweighed the benefits of a permanent adoptive home. We therefore need not address the juvenile court's finding, or absence thereof, with respect to the first element—whether father maintained consistent visitation throughout the case.

to be adopted by Ms. N. The children's counsel informed the juvenile court that Andrew and Khailan understood that Ms. N. wanted a closed adoption, and both children wished to remain with Ms. N.

There is substantial evidence in the record that the children's interests would be best served by the stability of adoption with their current caregiver, who met the children's daily physical and emotional needs. Ms. N. provided the children with a permanent and stable home; accompanied them to their extracurricular activities, therapy sessions, and medical appointments; and shared their daily experiences. The children were loving and comfortable with Ms. N. and said they wanted to be adopted and to live with her.

Father's claim that the juvenile court erroneously based its decision on the fact that he did not occupy a "parental" role in the children's lives is unavailing. Some appellate courts have expressed concern that a juvenile court's use of that term or similar terms such as "parental relationship" in the context of the beneficial parent-child exception suggest that an improper legal standard was applied. (See *In re J.D.* (2021) 70 Cal.App.5th 833, 864 [juvenile court's conclusory determination that mother's relationship with child did not "'amount to a parental bond'" did not address whether child had a substantial, positive emotional attachment to parent]; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1229-1230 [questioning whether juvenile court improperly "equated a parental role, as it related to application of the parent-child relationship exception, with the ability to parent 'on a fulltime basis'"].) That concern is not present here.

The juvenile court here stated on the record the court's findings regarding father's relationship with the children, and

11

the benefits of continuing that relationship did not outweigh the benefits the children would have from adoption. The juvenile court's observation that the parents needed to show a "parental role" does not persuade us that the court applied an incorrect legal standard in this case. The juvenile court did not abuse its discretion in finding that the beneficial parent-child exception to terminating parental rights did not apply.

Any error in the juvenile court's reasoning or basis for its decision was harmless in any event. Father was given a full and fair opportunity to present evidence on a contested issue. He presented no evidence at the section 366.26 hearing that the children had a "'substantial, positive emotional attachment'" to him that would outweigh the benefits of adoption. (*In re J.R.* (2022) 82 Cal.App.5th 526, 533.)

We reject father's contention that the juvenile court erred by not considering legal guardianship as the children's permanent plan. Adoption is the preferred permanent plan once a finding of adoptability has been made. (§ 366.26, subd. (c)(1); *In re S.B.* (2009) 46 Cal.4th 529, 532.) Legal guardianship is an alternative to adoption when a "child is living with a relative who is unable or unwilling to adopt the child because of circumstances that do not include an unwillingness to accept legal or financial responsibility for the child, but who is willing and capable of providing the child with a stable and permanent environment through legal guardianship." (§ 366.26, subd. (c)(1)(A).) Those circumstances do not exist here. The children's caregiver here, Ms. N., was strongly committed to adopting the children.

## DISPOSITION

The order terminating parental rights is affirmed.

_____
CHAVEZ, Acting P. J.

We concur:


_____
HOFFSTADT, J.


_____
BENKE, J.*

_____

*     Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13